*In re* MARRIAGE OF GREGORY O. ZEMAN, Petitioner-Appellee and Cross-Appellant, and SUSAN ZEMAN, Respondent-Appellant and Cross-Appellee.

Second District   No. 2—89—1074

Opinion filed June 20, 1990.

724

Hill, Van Santen, Steadman & Simpson, of Chicago, Stephen B. Ruben, of Stephen B. Ruben & Associates, Ltd., of Westchester, and Elizabeth W. Sexton and Thomas M. Newman, both of Peregrine, Stime, Newman, Ritzman & Bruckner, Ltd., of Wheaton, for appellant.

Mel Sloan and Mary J. Adams, both of Mel Sloan, Ltd., of Chicago, for appellee.

JUSTICE INGLIS delivered the opinion of the court:

Respondent, Susan M. Zeman, appeals from an order of the circuit court which found that there had been a substantial change in circumstances warranting a reduction in maintenance payments by petitioner, Gregory O. Zeman, from $1,750 per month to $900 per month. On appeal, Susan raises four issues: (1) whether the trial court prop-

erly considered Susan's inheritances; (2) whether the trial court erred in considering Gregory's payment of college expenses for the couple's youngest child; (3) whether the trial court erred in failing to consider the expenses incurred by Susan as legal guardian of their granddaughter; and (4) whether the trial court properly considered the aspects of Susan's retirement benefits. Three additional issues are raised by the cross-appeal filed by Gregory: (1) whether the trial court erred in granting Susan summary judgment on Gregory's petition to terminate maintenance; (2) whether the trial court erred in failing to reduce the maintenance payments to zero; and (3) whether the trial court erred in failing to grant Gregory retroactive reduction of his maintenance payments to the date his petition to modify was filed. We affirm.

Susan and Gregory Zeman were married on July 6, 1958. On October 13, 1981, Gregory filed a petition for dissolution of marriage. Susan was granted leave to file a counterpetition for dissolution on April 27, 1983. A marital settlement agreement was entered, and a hearing was conducted to prove up the agreement. Thereafter, a judgment of dissolution was entered on May 31, 1983, incorporating the settlement agreement. At the time of dissolution, five children had been born to the parties as a result of the marriage: Annette, age 23; Gregory, age 21; Daniel, age 20; Marguerite, age 16; and Peter, age 14. The parties agreed that they would have joint custody of the minor children and that Susan would have physical custody. To the extent of his financial ability, Gregory agreed to pay for the children's college expenses and for Peter's high school tuition. The parties acknowledged that their daughter, Marguerite, may suffer from a learning disability which would create future continued education and expenses and "[t]hat in the event that this is necessary, Gregory agree[d] to be responsible for the payment of this educational expense as well as a contribution to the support of the minor child, even after the child *** reach[es] her majority."

At the time of the dissolution, Susan was employed as school nurse with the Chicago Board of Education earning $16,000 per year. Gregory was employed as a board-certified allergist in private practice earning $80,000 per year. Pursuant to the settlement, Gregory agreed to pay Susan the sum of $2,000 per month for unallocated maintenance and child support for 18 months. Thereafter, the sum was to be reduced to $1,750 per month. It was agreed that the payments would be deducted from Gregory's taxes and would be included in Susan's income. As for modification or termination of the payments, the parties agreed "that only when the second child reaches majority shall

this present a change in circumstances for the purpose of any reduction in the maintenance, and each agrees that the maintenance shall not cease upon this event, but that maintenance shall only cease by operation of law." The parties further agreed that because Susan has had "various health problems which have caused her to be unavailable for employment from time to time," if she did become unemployed, "through no fault of her own, such as illness[,] other related medical problems, or the like, then this can be deemed to be a change in circumstances for the purpose of maintenance and support if need is shown."

The settlement agreement further provided that Susan was to receive the marital home. Gregory was to retain his pension and profit sharing plan relative to his medical practice. He was, however, to sell various outside business interests and divide the proceeds with Susan as provided in the agreement.

No further court action was taken by either party until June 24, 1988, when Gregory filed a petition to terminate maintenance. Therein, Gregory alleged that a substantial change in circumstances had occurred. Specifically, Gregory alleged, in part, that the couple's youngest child was 20 years old; that Gregory had contributed substantial monies toward the college and living expenses of all the children; that Susan has a master's degree and is currently employed by the Board of Education as a school nurse earning $25,000 per year; that Susan recently sold the former marital residence for approximately $160,000 with a mortgage balance outstanding of $40,000; and that Susan inherited substantial lakefront property in Pistakee Lake. As relief, Gregory prayed for the trial court to order Susan's maintenance terminated retroactive to the date the petition to terminate was filed.

In response, Susan filed a motion for summary judgment alleging that pursuant to the settlement agreement, the parties expressly precluded termination of maintenance except "by operation of law" and, under section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 510(c)), this requires the death of either party, the remarriage of Susan, or the cohabitation of Susan with another person. The mere change of circumstances is not sufficient. See *Rosche v. Rosche* (1987), 163 Ill. App. 3d 308, 312-13.

A hearing was held on February 8, 1989, addressing the motion for summary judgment. After arguments of counsel were heard, the trial judge ruled in favor of Susan, granting her motion. The judge stated that the language of the settlement agreement provided that

"maintenance *** shall only cease by operation of law," specifically, death, remarriage, or cohabitation, and that a substantial change of circumstances is not sufficient to terminate maintenance under the express language of the agreement. While counsel for Susan stated on the record that he would prepare an order, we find no written order in the record granting summary judgment.

On February 28, 1989, Gregory filed a petition to modify maintenance. The allegations in this petition were substantially the same as those alleged in the petition to terminate maintenance. However, as for relief, Gregory merely prayed for the trial court to "reduce or abate the amount of maintenance in accordance with the facts set forth hereto."

A hearing on Gregory's petition to modify was held on August 24 and 25, 1989. Susan testified that she was 54 years of age. When asked whether she was in "relatively good health," Susan responded that she was not. She explained that she had severe back problems, a left-sided pain, and bad feet. Susan admitted that prior to the divorce she was hospitalized several times for psychiatric treatment, but since the divorce she has only been hospitalized once and that was for a three-day weekend. She stated that she presently sees a psychiatrist approximately once a year and has to take lithium on a daily basis. However, her health has not caused her to cease or suspend her employment as a school nurse for the Chicago Board of Education. In 1982, she earned $16,000 in this capacity. By 1988, according to the parties' stipulation, Susan's income had increased to $26,505.84 (i.e., $2,208.82 monthly gross income).

The parties stipulated that the following monies are withheld monthly from Susan's current income:

| | |
|---|---|
| Federal tax | $556.74 |
| State tax | 80.42 |
| Pension contribution | 22.10 |
| Annuity | 752.00 |
| Deferred Pay | 592.60 |

Susan testified that the pension contribution is not a voluntary contribution. However, the annuity and deferred pay are voluntary deductions. Susan stated that she began contributing to the annuity in 1985, resulting in a balance of $22,521 in that account. In 1986 or 1987, she began the deferred pay deduction. Susan explained that this deduction allows her to be paid on a 12-month basis instead of a 10-month basis.

Susan claimed, by way of a financial declaration, that her basic monthly expenses are as follows:

| Mortgage | $665.12 |
|---|---|
| Taxes & Insurance | 379.17 |
| Utilities | 288.31 |
| Food | 628.58 |
| Maintenance (townhouse & yard) | 80.00 |
| Transportation (auto payments, gas, oil, license and insurance | 636.47 |
| Furniture and home repair | 500.00 |
| Personal (clothing, medical expenses, insurance & miscellaneous) | 1,820.72 |
| Expenses for Jackie Zeman | 676.06 |
| Expenses for Marguerite and Peter | 229.44 |
| TOTAL | $5,903.87 |

Susan testified that her daughter, Marguerite, lived with her in the marital residence until September 1985. Prior to that date, Marguerite had a child, Jacqueline. Susan is the legal guardian of her granddaughter, Jacqueline. Susan's son, Peter, resides with her when he is not attending Northern Illinois University. Susan stated that she pays for Peter's clothes and car expenses. Thus, Susan included these expenses when totaling her monthly expenses.

Susan alleged that her net monthly income, which included dividends, interest, and maintenance payments of $1,750, minus deductions, totalled $4,432.59. Thus, by her figures, Susan was presently exceeding her monthly means by $1,471.28.

As for her assets, Susan testified that she sold the marital residence in 1988 for $160,000 and purchased a townhouse for $195,000 in October 1988. Susan realized $116,000 from the sale of the marital residence, all of which went for the down payment on her townhouse. Susan was able to apply enough liquid monies so that she only had to take out a mortgage of $75,000 to effectuate the sale. Susan testified that one of the primary reasons she sold the marital residence was because it was very expensive to maintain. Susan also purchased an automobile in 1988 which cost approximately $15,000. After a trade-in and down payment, she financed approximately $8,000 of the purchase price of the car.

Subsequent to the time the judgment of dissolution was entered, Susan received several inheritances. In 1985, she received $17,000 from an aunt. However, Susan testified that all of the money had been spent on living expenses because her salary and maintenance do not meet her needs. When asked whether she could trace the money, Susan answered, "I probably could trace it to investing it into mutual funds, and then I can certainly trace it out of mutual funds."

From her father, Susan inherited $50,000 and some property valued at $125,000 at Pistakee Lake. Although the property produces some rental income, specifically, $700 a month for approximately nine months of the year, Susan testified that this "is a wash, as far as expenses go." Susan stated that she keeps the house, in part, because of sentimental reasons; her family has owned the land since 1904 and her grandfather built the house.

In addition, Susan inherited $66,000 from Richard Stoekert, some silver coins, a gun collection, and a car. She expects to receive another $220,000 in stocks and has consulted financial advisors as to how best to make the transfer. Estate expenses and attorney fees have not been paid for the estate yet.

The parties stipulated that Susan had approximately $9,000 in a savings account, $20,000 in cash reserves, bond funds and money markets. It was further stipulated that Susan had the following monies set aside for retirement:

| | |
|---|---|
| Cigna Annuity | $22,521.20 |
| Fidelity IRA | 13,430.61 |
| Kemper Financial | 4,136.00 |

Susan also had a retirement plan with the Board of Education for an undetermined amount whereby she would receive $214 per month if she retired now, and $584.50 if she retired on June 1, 1991.

It was stipulated that in 1982 Gregory earned $80,000 in his income as a board-certified allergist in his own private practice. By 1988, his income had increased to approximately $194,000. Gregory testified that the gross income from his practice in 1988 was approximately $400,000. Of that amount, $60,000 is paid to his associate allergist. Gregory pays approximately $30,000 to his present wife whom he married subsequent to his divorce; she is employed as the general office manager of his practice. In addition, he employs five other part-time employees. Gregory stated that he anticipates that his income next year will probably be lower due to the employment of the associate.

Gregory testified that both he and his present wife are in good health and receive annual physicals. Gregory stated that he enjoys playing tennis and keeping fit.

Gregory testified, by way of affidavit, that his monthly expenses are as follows:

| | |
|---|---|
| Mortgage, taxes and interest | $1,629.23 |
| Association fees | 138.59 |
| Utilities | 180.00 |
| Food (including restaurants) | 800.00 |

| | |
|---|---|
| Maintenance on condominium & insurance | 102.00 |
| Transportation (gas, repairs, license and insurance) | 238.00 |
| Laundry-cleaning | 70.00 |
| Home Furnishings | 1,250.00 |
| Personal (clothing, medical, insurance and miscellaneous) | 2,301.00 |
| Profit Sharing Plan | 1,892.00 |
| Maintenance for Susan | 1,750.00 |
| Expenses for Jacqueline (if applicable) | 101.00 |
| Expenses for Marguerite (if applicable) | 15.00 |
| Expenses for Peter's college | 576.00 |
| TOTAL | $11,042.82 |

Gregory alleged that his net monthly income was $11,705.83. Thus, by his figures, his income was exceeding his expenses by only $663.01 per month.

As for assets and liabilities, Gregory testified that in 1983 he purchased a condominium for $89,000. There are two mortgages on this property totalling approximately $87,000. Money from the second mortgage was used to purchase a parcel of property on St. Thomas in the Virgin Islands costing approximately $37,000. Gregory owns a piece of art work which he purchased for a total of $18,000, with $7,000 still owing. Gregory has approximately $13,000 in savings. It was stipulated that Gregory has an IRA account worth $37,656.83 and a pension profit sharing plan worth $413,586.53, subject to an encumbrance of $125,000.

On August 30, 1989, the trial judge issued a letter of opinion stating that he had "taken into consideration the testimony of the parties, the stipulation of the parties, the documents received in evidence and the relevant sections of Chapter 40" and found:

"[A] substantial change of circumstance has occurred subsequent to the entry of the Judgment. The minor children are not [sic] emancipated. The Petitioner is paying all of the youngest child's college expenses and the Respondent has inherited substantial sums, the majority of which are income producing. It should be further pointed out that the Respondent has for the past years been deducting approximately $750.00 per month from her income and setting the same in a deferred compensation program [i.e., the annuity]."

Thus, the court determined that the maintenance payment should be modified from $1,750 per month to $900 per month effective September 1, 1989. An order to that effect was entered October 3, 1989. Susan appeals and Gregory cross-appeals.

On appeal, Susan argues that the trial court abused its discretion in reducing her maintenance based on a substantial change in the parties' circumstances. Susan contends, *inter alia*, that the trial court made four reversible errors with regard to the evidence. Specifically, Susan contends that the trial court erred in: (1) failing to determine the amount of income which could be generated from the inheritances received by Susan, rather than their value; (2) taking into consideration the payment of Peter's college expenses by Gregory; (3) failing to take into consideration expenses incurred by Susan as legal guardian of their granddaughter, Jacqueline; and (4) failing to consider all aspects of Susan's retirement benefits.

■ As to the first alleged error, Susan maintains that the trial court erred when it determined that the inheritances received by Susan constituted a substantial change in her circumstances. She argues that although the trial court held that a majority of Susan's inheritances are income producing, the court failed to make any determination of the amount of income which could be generated therefrom. Susan acknowledges that under Illinois law it is proper for the court to take into consideration nonmarital assets, such as inheritances, in making an initial award of maintenance. (*In re Marriage of Benz* (1988), 165 Ill. App. 3d 273, 287; *In re Marriage of Smith* (1981), 100 Ill. App. 3d 1126, 1130.) However, she contends that it is the income produced by the property, rather than its value, which is to be considered. *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1088.

Gregory argues that much of the sums inherited by Susan were liquid, namely: $17,000 cash received from an aunt; $50,000 cash received from her father; and $66,000 received from the Stoekert estate. In addition, Susan is expected to receive $220,000 worth of stock from the Stoekert estate but is waiting transfer while consulting with financial advisors. The only nonliquid asset Susan inherited is the Pistakee Lake property, worth $125,000, and which she testified is rented for $700 per month for nine months out of the year.

Susan argues that $67,000 of the cash inheritances cannot be considered as income producing because she testified that she spent the money on her living expenses, *i.e.*, the $17,000 from her aunt and the $50,000 from her father. Susan further contends that the income produced from the Pistakee Lake property was insufficient to meet the expenses of the property. Thus, assuming we accept Susan's contentions, there remains the $66,000 received from the Stoekert estate plus the $220,000 worth of stock.

■ ■ Although Susan had not yet taken control of the stock at the time of the hearing, the trial court was still permitted to consider

it in determining whether there was a substantial change in circumstances. (*Smith,* 100 Ill. App. 3d at 1130.) Further, a court may take judicial notice of the fair earning powers of money or invested capital over a certain period of time. (*Smith,* 100 Ill. App. 3d at 1130.) In the trial judge's letter of opinion, he noted that Susan "has inherited substantial sums, the majority of which are income producing." Thus, we find that it fairly appears from the record that the trial judge did, in fact, consider the income potential of Susan's inheritances. (*In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 632.) Thus, the case at bar is distinguishable from *In re Marriage of Ryman* (1988), 172 Ill. App. 3d 599, 611-12, where the appellate court reversed the trial court for refusing to consider *any* specific income figure from the wife's inheritances in setting the maintenance. While it is clear that some approximation of the income-producing ability of the inheritances is required, explicit findings by the trial court are not required so long as a sufficiently detailed basis exists in the record to support the award. (*Mittra,* 114 Ill. App. 3d at 632.) We find such a basis exists in the case at bar.

Second, we consider Susan's contention that the trial court committed reversible error in determining that Gregory's payment of Peter's college expenses constituted a substantial change in the circumstances. Susan argues that, pursuant to the marital settlement agreement, Gregory was obligated to pay Peter's college expenses. Thus, she argues, citing *Sullivan v. Sullivan* (1981), 98 Ill. App. 3d 928, the fact is *res judicata* and cannot justify modification of the maintenance as a substantial change in circumstances.

The settlement agreement specifically provided: "Gregory agrees to the extent of his financial ability to pay for the college education of the children of the parties; said payments shall include, all expenses, and other fees necessary toward each child's attainment of a bachelor's degree." The agreement then set forth the college education being attained by three of the children, Annette, Gregory, and Daniel, and provided that Gregory was to bear the cost of that education. It further stated that Gregory was to pay for the cost of Peter's high school education and "undertake to pay [Peter's] college expenses in the same manner as he has undertaken with the other children."

■ We agree with Susan that Gregory's obligation to pay for Peter's education was made *res judicata* by the settlement agreement and changed circumstances justifying modification of maintenance must have occurred after the judgment for dissolution. However, the judgment, which provided for an unallocated amount for child support and maintenance, further provided that when Peter reached majority

it would present a change in circumstances for the purpose of any reduction in maintenance. Thus, because Peter is now emancipated, the maintenance award may be reduced. Recognition of the fact that Gregory, rather than Susan, is paying for all of the emancipated child's college expenses is not improper as it pertains to the relative financial abilities of the parties and is not a redetermination of that responsibility.

Third, we consider Susan's contention that the trial court committed reversible error in failing to consider the expenses incurred by her as legal guardian of her granddaughter, Jacqueline Zeman. At the hearing on Gregory's petition to modify maintenance, the following exchange occurred:

"BY MR. RUBEN [counsel for Susan]:

Q. Are you the legal guardian of Jacquelyn [*sic*] Zeman?

A. [Susan] That's correct.

Q. And how long have you been the legal guardian?

MR. SLOAN [counsel for Gregory]: Objection.

THE COURT: Sustained.

MR. RUBEN: Your Honor, for the record, I believe the Court must consider the entire social conditions of the parties during the post-decree. The statute provides, and the case law says, that when establishing maintenance and when considering a modification of maintenance, one must look to the same factors that the parties considered when they agreed to maintenance in the beginning, that is, the ages, the health, the medical conditions, and the—.

THE COURT: Excuse me, Mr. Ruben. It doesn't indicate that if your client decides to take in a boarder or to give free room and board to a granddaughter and to maintain the granddaughter subsequent to the entry of a judgment, that that is a condition relative to her rights of maintenance.

Next question, please.

MR. RUBEN: Well, I find exception to it, and I want it noted on the record.

THE COURT: Sure.

MR. RUBEN: I believe it is a social condition which the Court must take into consideration.

THE COURT: She testified, Mr. Ruben, that it was subsequent to the entry of the judgment.

MR. RUBEN: I understand that.

THE COURT: Thank you."

Susan argues that because the parties acknowledged Marguerite's

disabilities in the settlement agreement and a continuing obligation to support her, testimony should have been given regarding Jacqueline's expenses. She maintains that "[d]ue to Marguerite's disabilities, Susan and Gregory's support of Jacqueline is actually continuing support to Marguerite" and thus not purely voluntary but contemplated under the provisions of the agreement. The agreement provided, in part:

"The parties acknowledge that the minor child, Marguerite, may suffer from a learning disability which would create future continued education and expenses. That in the event that this is necessary, Gregory agrees to be responsible for the payment of this educational expense as well as a contribution to the support of the minor child, even after the child would reach her majority."

■ Our reading of the agreement indicates that the parties agreed to be obligated for the support of Marguerite, not for the support of her family. Thus, Susan's voluntary decision to do so, and her expenses incurred thereby, need not be considered in determining her reasonable needs and whether a change of circumstances has occurred. See *In re Marriage of Silber* (1988), 176 Ill. App. 3d 853, 856-57.

We note that Susan also argues, in support of her claim that she should have been allowed to testify as to Jacqueline's expenses, that Gregory "was permitted to testify as to the amounts of support he gave Jacqueline each month." This testimony came by way of affidavit, introduced before Susan's testimony, whereby Gregory listed as expenses for Jacqueline a total of $101 "if applicable." Counsel for Susan cross-examined Gregory about these expenses; however, Gregory's counsel repeatedly objected, and the following exchange occurred:

"Q. [counsel for Susan asking Gregory]: Other than these expenditures that you list *** relating to Jacquelyn [*sic*], do you make any—or have you made any voluntary contributions to Mrs. Zeman with respect to Jackie's support in the last year?

MR. SLOAN [counsel for Gregory]: Objection.

THE COURT: Sustained.

MR. RUBEN [counsel for Susan]: Your Honor, they have raised the question in the affidavit. He has listed these items.

THE COURT: You cross examined on the issue. I don't think we have to go any further. What the parties want to do voluntarily in taking care of their grandchildren should not be a bearing upon whether or not Mrs. Zeman is entitled to maintenance."

The above exchange clearly indicates that the trial judge determined that the payments made by both parties with regard to Jacqueline were purely voluntary and would not be considered in modifying maintenance. We do not find this determination to be in error.

Fourth, we consider Susan's contention that the trial court committed reversible error in failing to consider all aspects of her retirement benefits. In its letter of opinion, the trial judge stated, "[i]t should be further pointed out that the Respondent has for the past years been deducting approximately $750 per month from her income and setting the same in [an annuity account]." Susan argues that the trial court erred in refusing to allow her to testify that she would not receive social security benefits, which therefore necessitated the deferral of $750 per month to provide for her retirement. In addition, Susan argues that the trial court erred in failing to recognize that Susan will incur tax liability on the deferred income at some time in the future.

■■ ■ Section 504(b)(7) of the Illinois Marriage and Dissolution of Marriage Act provides that a trial court, in setting maintenance, may consider the tax consequences of the property division upon the respective economic circumstances of the parties. (Ill. Rev. Stat. 1989, ch. 40, par. 504(b)(7).) However, the tax consequences to which Susan refers relate not to the division of property but, rather, to her future financial condition. This is simply irrelevant in determining Susan's maintenance, as the trial court is generally required to consider the parties' economic circumstances as they exist at the time of the maintenance determination. (*In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 265.) Further, the alleged fact that Susan must diminish her financial resources (see Ill. Rev. Stat. 1989, ch. 40, par. 504(b)(1)) in paying for the deferred income because she will not receive social security is similarly irrelevant. At this time, it is not Gregory's responsibility to provide for Susan's retirement. The fact that Susan chooses to do so now cannot change this. Thus, the trial court did not err in refusing to permit Susan to testify as to future social security benefits or lack thereof.

Next, we address the issue raised by both Susan and Gregory as to whether the trial court abused its discretion in the modification of maintenance. Susan argues that it was an abuse of discretion for the trial court to determine that there was a substantial change in circumstances warranting a reduction of maintenance. In contrast, Gregory argues that the trial court abused its discretion in failing to reduce the maintenance payments to zero.

■■■ We note that a trial court may modify a maintenance

award "only upon a showing of substantial change in the circumstances." (Ill. Rev. Stat. 1989, ch. 40, par. 510(a).) The party seeking modification bears the burden of showing this change. (*In re Marriage of Ingram* (1989), 185 Ill. App. 3d 395, 398.) In determining whether to modify maintenance and to what degree, the trial court is to consider the same factors which, under the statute, are to be assessed in making the initial award. (Ill. Rev. Stat. 1989, ch. 40, par. 504; *Ingrassia v. Ingrassia* (1987), 156 Ill. App. 3d 483, 489.) The factors include: the financial resources of the party seeking maintenance, including marital property apportioned to her; the standard of living established during the marriage; the duration of the marriage; the age and the physical and emotional condition of both parties; the ability of the spouse seeking maintenance to meet her needs independently; and the ability of the other spouse to pay. The decision to modify or terminate maintenance payments rests within the sound discretion of the trial court, and such a decision will not be disturbed on review absent an abuse of that discretion. *Ingram*, 185 Ill. App. 3d at 399.

Susan argues that when the appropriate factors are taken into consideration, her maintenance should not be reduced. Specifically, she points out that (1) she and Gregory were married 25 years and had five children; (2) Susan has and continues to suffer from certain health problems while Gregory enjoys good health; (3) the parties established a comfortable lifestyle during the marriage; (4) Gregory's monthly income is more than adequate to meet his own needs while paying $1,750 per month in maintenance to Susan; and (5) Susan's financial resources, including $1,750 per month in maintenance, do not meet her fixed monthly expenses. She argues that the effect of the reduction in maintenance will require her to deplete her assets in order to meet her living expenses, which under Illinois law she should not be required to do. *In re Marriage of Ryman* (1988), 172 Ill. App. 3d 599, 612.

■■■ However, our review of the record does not indicate that the trial court abused its discretion in determining that a substantial change in the circumstances had occurred. Pursuant to the marital settlement agreement, Susan was initially awarded $2,000 per month for the maintenance and support of herself and the two minor children. This was at a time when her yearly salary was approximately $16,000. It was agreed that after 18 months the award would be reduced to $1,750. Gregory argues that the "step-down" in the monthly sum was commensurate with Marguerite reaching the age of majority. The parties did agree that when the second child (*i.e.*, Peter) reaches majority this shall present a change in circumstances for the purpose

of any reduction in maintenance. Peter reached the age of majority in 1987, and Gregory filed his petition to modify in 1989, at which time Susan was earning approximately $26,000 and had received substantial income-producing inheritances. We believe this is a sufficient change in circumstances to warrant reduction in the award despite Susan's claim that her income is insufficient and Gregory's is more than sufficient. The award provided in the decree, although unallocated, was clearly intended as maintenance and child support. Susan is no longer obligated to support the children as they are all emancipated, and it was agreed that Gregory would provide for their education, which he has done. Thus, the unallocated payments for maintenance and child support are no longer necessary in the amount of $1,750, given that Susan's financial condition has only improved since the entry of the judgment of dissolution.

However, we do not accept Gregory's argument that the trial court abused its discretion in refusing to reduce the maintenance payments to zero. A reduction to $900, as ordered by the trial court, appears to be appropriate given the length of the couple's marriage, the marital standard of living, and the parties' financial resources. The figures presented by Gregory as to his recommended financial dealings for Susan are unpersuasive. Similarly, Gregory's argument that it is an abuse of discretion not to terminate maintenance when the statutory goals of maintenance have been achieved is likewise without merit in the case at bar. In *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 634, the appellate court held that the party receiving maintenance is required to get the training and skills necessary to become financially independent. The court so held relying on the goals of maintenance, which are " 'to obviate marriage-conditioned needs and to enable a formerly dependent spouse to acquire financial independence for the future.' " (*Mittra*, 114 Ill. App. 3d at 635, quoting Ill. Ann. Stat. ch. 40, par. 504(b)(2), Historical & Practice Notes, at 529 (Smith-Hurd 1980).) Once this independence has been achieved and the marriage-conditioned needs are obviated, maintenance should be terminated. (*In re Marriage of Henzler* (1985), 134 Ill. App. 3d 318, 322-23.) However, no such showing has been made in the case at bar. Even with her inheritances and salary, Susan has demonstrated that she may have some difficulty in meeting her reasonable needs as defined by the marriage. Thus, even in light of the statutory goals of maintenance, we cannot say that the trial court's ruling was an abuse of discretion.

Next, we address Gregory's argument that the trial court erred in granting Susan's motion for summary judgment on his peti-

tion to terminate. We have noted that, prior to filing the petition to modify, Gregory had filed a petition to terminate. In response, Susan filed a motion for summary judgment, alleging that pursuant to the settlement agreement the parties expressly limited the circumstance under which maintenance could be terminated, namely, "by operation of law," which, under the statute, requires death, remarriage, or co-habitation (see Ill. Rev. Stat. 1989, ch. 40, par. 510(c)). At the hearing on the matter, the trial judge ruled in favor of Susan, finding that a substantial change of circumstances was not sufficient to terminate maintenance under the express language of the agreement. Counsel for Susan then stated that he would prepare an order; however, we find no written order in the record granting summary judgment. Until a written judgment is filed, the proceedings are in a state of temporary abeyance, and the bare announcement of the final judgment cannot be appealed. (*In re Marriage of Black* (1987), 155 Ill. App. 3d 52, 54; *Green v. Green* (1974), 21 Ill. App. 3d 396, 403; see also 107 Ill. 2d R. 272.) Thus, we do not have jurisdiction to consider this issue.

Finally, we address Gregory's argument that he was entitled to a retroactive reduction of the maintenance to the date of the filing of his petition to modify maintenance. We note that in his petition to modify Gregory did not pray for such relief. Gregory argues that he is nonetheless entitled to modification from the date his petition was filed because he made a showing of changed circumstances. While it is true that on a proper showing of changed conditions a party may be entitled to a modification from the date of his petition, the decision to allow retroactive modification is still within the trial court's discretion and will not be overturned on review absent an abuse of discretion. (*In re Marriage of Geis* (1987), 159 Ill. App. 3d 975, 988.) We find no such abuse in the case at bar. As Susan points out, at the time Gregory's petition was filed, she had not yet inherited approximately $220,000 worth of stock that she was expected to inherit. Thus, although there was a sufficient change in the circumstances to warrant modification, the circumstances at the time the petition was filed did not mandate that the modification be made retroactive.

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

REINHARD and DUNN, JJ., concur.